JANICH BROS., INC.,
Plaintiff-Appellant,

v.

The AMERICAN DISTILLING CO.,
Defendant-Appellee.

No. 74–3167.

United States Court of Appeals,
Ninth Circuit.

Dec. 14, 1977.

As Amended on Denial of Rehearing and
Rehearing En Banc March 1, 1978.

Joseph M. Alioto (argued), San Francisco, Cal., for plaintiff-appellant.

Philip B. Bass (argued), of Titchell, Maltzman & Mark, San Francisco, Cal., for defendant-appellee.

Before BARNES, CHOY and WALLACE, Circuit Judges.

WALLACE, Circuit Judge:

This is a private antitrust action for treble damages and injunctive relief pursuant to sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26. Plaintiff and appellant Janich Bros., Inc. (Janich) is a rectifier of alcoholic beverages. It processes, bottles, and distributes its product for sale in California. Defendant and appellee The American Distilling Company (American) is a distiller. It manufactures alcoholic beverages and markets its product throughout the United States.

In an action initiated in 1967, Janich claimed that since 1963 American, through its pricing policies, had attempted to monopolize the sale of private label[1] gin and vodka in California in violation of section 2 of the Sherman Act, 15 U.S.C. § 2. In addition, Janich claimed that American had sold gin and vodka of like grade and quality at discriminatory prices in violation of section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a). Janich also claimed that as a result of these activities, it was precluded from making sales of private label gin and vodka to large chain store retailers and also suffered a loss of customers and reduced sales to its existing customers. No specific dollar figure was attached to these losses.

American counterclaimed, alleging that Janich, at least since 1962, had engaged in price discrimination in violation of section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a). In addition, American charged that Janich, since 1961, had engaged in a conspiracy to set prices in violation of section 1 of the Sherman Act, 15 U.S.C. § 1.

A jury was selected and after the close of Janich's case, the district judge directed a verdict dismissing the attempt to monopolize claim. At the end of the entire case, the jury returned its verdict in favor of American on Janich's Robinson-Patman claim. Subsequent to the jury verdict, American moved for and the district court ordered a dismissal of the counterclaim.

The first assigned error in Janich's appeal is that the district judge improperly directed a verdict on the section 2 claim. Janich also asserts numerous errors in the trial judge's admission or exclusion of evidence, his instructions to the jury on the Robinson-Patman claim, and his comments on the evidence. We affirm.

## I. *Predatory Conduct*

 Janich's primary argument on appeal is that the district court erred in directing a verdict on the attempt claim. In resolving this issue, our task is to determine whether a reasonable jury could have found that American attempted to monopolize. *Calnetics Corp. v. Volkswagen of America,*

---

1. Private labels are labels or brand names which are owned and controlled by the retailer rather than by the manufacturer or wholesaler.

*Inc.,* 532 F.2d 674, 683–84 (9th Cir.), *cert. denied,* 429 U.S. 940, 97 S.Ct. 355, 50 L.Ed.2d 309 (1976). If there is substantial evidence that would support a finding for Janich by reasonable jurors, the directed verdict must be reversed.[2] *Chisholm Bros. Farm Equip. Co. v. International Harvester Co.,* 498 F.2d 1137, 1140 (9th Cir.), *cert. denied,* 419 U.S. 1023, 95 S.Ct. 500, 42 L.Ed.2d 298 (1974). In making this determination, we must consider all the evidence and all reasonable inferences which may be drawn from the evidence in a light most favorable to Janich, the party against whom the motion for a directed verdict was made. *Continental Ore Co. v. Union Carbide & Carbon Co.,* 370 U.S. 690, 696, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962); *Calnetics Corp. v. Volkswagen of America, Inc., supra,* 532 F.2d at 684.

██ Before considering the facts of his case, it is necessary to determine what evidence a plaintiff must introduce to avoid a directed verdict. This is not a simple chore. Even within our circuit we have not provided a clear and meaningful test, although at first glance the requirements established by our cases appear relatively straightforward. To establish a prima facie case, a plaintiff must prove three elements. The first two are specific intent to control prices or destroy competition with respect to a part of commerce (element 1) and predatory conduct directed to accomplishing the unlawful purpose (element 2). *Hallmark Industry v. Reynolds Metals Co.,* 489 F.2d 8, 12–13 (9th Cir. 1973), *cert. denied,* 417 U.S. 932, 94 S.Ct. 2643, 41 L.Ed.2d 235 (1974) [hereinafter referred to as *Hallmark* ]; *Lessig v. Tidewater Oil Co.,* 327 F.2d 459, 474 (9th Cir.), *cert. denied,* 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964); *see Industrial Bldg. Materials, Inc. v. Interchemical Corp.,* 437 F.2d 1336, 1344 (9th Cir. 1970). The third is a "dangerous probability of success" (element 3). *Hallmark, supra,* 489 F.2d at 12; *Moore v. Jas. H. Matthews & Co.,* 473 F.2d 328, 332 (9th Cir. 1973); *see Bushie v. Stenocord Corp.,* 460 F.2d 116, 121 (9th Cir. 1972).

██ While these three elements seem clear, they have not always been interpreted with ordinary meaning. For example, a dangerous probability of success (element 3) does not necessarily require direct proof of market power such that the defendant's actions, if unchecked, would result in actual monopoly. While direct proof of market power is one means of establishing this element, it is not always essential. *Hallmark, supra,* 489 F.2d at 12; *Moore v. Jas. H. Matthews & Co., supra,* 473 F.2d at 332; *see Industrial Bldg. Materials, Inc. v. Interchemical Corp., supra,* 437 F.2d at 1344. We have held that the trier-of-fact may infer dangerous probability of success from proof of specific intent to control prices or destroy competition in a portion of the market without legitimate business purpose (element 1), accompanied by predatory conduct toward that end (element 2). *Hallmark, supra,* 489 F.2d at 12; *Lessig v. Tidewater Oil Co., supra,* 327 F.2d at 474 & n.46.[3]

██ The interrelation between the three elements does not necessarily end here, however. In some cases we have also held that the trier-of-fact may infer the first element, specific intent, from proof of the second, predatory or anticompetitive conduct directed to accomplishing the unlawful purpose. *Hallmark, supra,* 489 F.2d at 12; *see Lessig v. Tidewater Oil Co., supra,* 327 F.2d at 475, so long as this con-

---

2. Substantial evidence is "more than a mere scintilla." *Chisholm Bros. Farm Equip. Co. v. International Harvester Co.,* 498 F.2d 1137, 1140 (9th Cir.), *cert. denied,* 419 U.S. 1023, 95 S.Ct. 500, 42 L.Ed.2d 298 (1974). " 'It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Washington v. United States,* 214 F.2d 33, 41 (9th Cir.), *cert. denied,* 348 U.S. 862, 75 S.Ct. 86, 99 L.Ed. 679 (1954).

3. Our holding in *Lessig* was based on the "not unreasonable assumption that the actor is better able than others to judge the practical possibility of achieving his illegal objective." *Lessig v. Tidewater Oil Co.,* 327 F.2d 459, 474 (9th Cir.), *cert. denied,* 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964).

duct can serve as the basis for a substantial claim of restraint of trade.[4] *Hallmark, supra,* 489 F.2d at 12–13; *Bushie v. Stenocord Corp., supra,* 460 F.2d at 121.

■ While there is great wisdom in requiring proof of each of these three elements separately, we cannot question that at least in the factual situations encompassed by certain of our cases, our circuit has allowed a short-cut method of establishing liability. Thus, while a plaintiff must present substantial evidence on all three elements of attempted monopolization to avoid a directed verdict, proof of predatory or anti-competitive conduct which can serve as the basis for a substantial claim of restraint of trade will, in some circumstances, permit an inference of specific intent and then in turn of dangerous probability. Thus, we may limit our initial task to a determination of whether a reasonable jury could conclude that American engaged in such conduct.

Leaving aside the issue of whether the specified acts could form the basis of a substantial claim of restraint of trade, in this case Janich alleges two separate instances of predatory conduct. It asserts primarily that American maintained a two-tiered system of pricing, with one set of prices for sales outside California and another for sales within California. In addition, it asserts that American carried out a program of below-cost pricing. We deal first with the charge of the two-tiered pricing system.

## A. *Discriminatory pricing.*

Janich alleged that American engaged in price discrimination, charging a lower price for goods sold in California than for goods of like grade and quality sold outside of California. Geographical price differentiation presents a different problem from across-the-board price cuts. A firm which cuts its price in a single geographical area and maintains high prices outside of that area may be able to maintain a satisfactory revenue position. Consequently, it may have considerably more staying power than a competing firm which is limited to a single geographical area.

Under these circumstances, it may be possible for a geographically broad-based firm pricing at a cost in a single area to drive out a more efficient competitor which operates only in that area. However, it is unnecessary for us to consider in detail whether the charge of discriminatory pricing in this case lays a basis for recovery. All we need do is look at the overall circumstances to determine if American's geographical price differentiation was sufficient as a matter of law to sustain a charge of attempted monopolization. *See* L. Sullivan, Antitrust, 108–13 (1977).

■ As a first step, we conclude that a geographical price differential cannot sustain a charge of attempted monopolization unless it is shown to have a substantial effect on competition. In this regard, we take guidance from the Congressional treatment of price differentiation in section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a).[5]

4. If this approach is used by the trial court, it should be remembered that the intent which may be inferred from conduct will depend upon the circumstances in which the conduct occurs. For example, the same aggressive conduct which is seen only as a reaction to competition by a small firm may suggest intent to monopolize where carried out by a firm with a significant market power. Where a plaintiff relies only upon a defendant's conduct to establish an attempted monopolization claim and does not show market power, specific intent to monopolize should ordinarily be inferred only where the alleged conduct is of a kind clearly threatening to competition or clearly exclusionary. Thus, where the plaintiff does not allege and prove market power (element 3), he must dem-

onstrate conduct which is clearly threatening to competition or clearly exclusionary in order to show "predatory conduct which may form the basis of a substantial claim of restraint of trade." *See generally* L. Sullivan, Antitrust 134–40 (1977). This is the type of circumstantial evidence which may be used to prove the requisite intent.

5. Section 3 of the Robinson-Patman Act, 15 U.S.C. § 13a, explicitly deals with geographical price discrimination. A private cause of action, however, will not lie for violations of this section. *Nashville Milk Co. v. Carnation Co.,* 355 U.S. 373, 78 S.Ct. 352, 2 L.Ed.2d 340 (1958); *Safeway Stores, Inc. v. Vance,* 355 U.S. 389, 78 S.Ct. 358, 2 L.Ed.2d 350 (1958).

This section prohibits price discrimination between different purchasers of commodities of like grade and quality "where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition."[6]

Where, as here, a price differential threatens a primary line injury, i. e. injury to the seller's competitors, section 2 of the Sherman Act, 15 U.S.C. § 2, and section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a), are directed at the same economic evil and have the same substantive content. *Areeda & Turner, Predatory Pricing and Related Practices Under Section 2 of the Sherman Act*, 88 Harv.L.Rev. at 697, 727 (1975). They are both meant to protect the competitive process. *See* L. Sullivan, Antitrust, 684 (1977). Yet in 15 U.S.C. § 13(a), Congress proscribed only those price differences which have a substantial effect on competition. In effect, Congress has determined that price differentiation poses a threat to competition sufficient to justify legal intervention only where such an effect can be shown. Thus, where the plaintiff alleges a geographical price difference as the basis of a section 2 claim, it is appropriate to require the same showing of substantial effect as is required in a Robinson-Patman claim.

Having determined that such an effect must be shown, we need go no further. The jury determined that American's price differential had no substantial effect on competition. While this pertained to the Robinson-Patman claim, the issue determined was identical to that which the jury would have been required to decide as part of the section 2 claim. Because of the jury's decision, the section 2 claim would necessarily have been decided against Jan-

ich. Thus, even if the district judge erred in granting a directed verdict on the section 2 claim insofar as it was based on geographical price differentiation, a question we do not decide, the error was harmless.

## B. *Below-cost pricing.*

A business may choose to price at non-remunerative levels in order to exclude or drive out its rivals. Such "predatory pricing" may be a means of obtaining or maintaining a monopoly position in violation of section 2 of the Sherman Act, 15 U.S.C. § 2. *See, e. g., United States v. American Tobacco Co.*, 221 U.S. 106, 160, 182, 31 S.Ct. 632, 55 L.Ed. 663 (1911); *Standard Oil Co. v. United States*, 221 U.S. 1, 43, 31 S.Ct. 502, 55 L.Ed. 619 (1911).

That legal standard, however, must be applied with a practical understanding of business realities. Even legitimate price decreases will necessarily have a non-remunerative effect upon other firms in the market. These decreases will reduce competitors' profit margins and they may drive the inefficient firm out of business while the firm which originally reduced prices continues to make a profit. It is the very nature of competition that the vigorous, efficient firm will drive out less efficient firms. This is not proscribed by the antitrust laws. "Antitrust legislation is concerned primarily with the health of the competitive process, not with the individual competitor who must sink or swim in competitive enterprise." *International Air Ind., Inc. v. American Excelsior Co.*, 517 F.2d 714, 721 (5th Cir. 1975), *cert. denied*, 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976), *quoting Anheuser-Busch, Inc. v. FTC*, 289 F.2d 835, 840 (7th Cir. 1961) *and Atlas Bldg. Products Co. v. Diamond Block & Gravel Co.*, 269 F.2d 950, 954 (10th Cir. 1959), *cert. denied*, 363 U.S. 843, 80 S.Ct. 1608, 4 L.Ed.2d 1727 (1960); *see also Brunswick Corp. v. Pueblo*

---

**6.** It is clear that there can be no violation of the Robinson-Patman Act if the price differential has no adverse effect on competition. *Continental Baking Co. v. Old Homestead Baking Co.*, 476 F.2d 97, 103 (10th Cir.), *cert. denied*, 414 U.S. 975, 94 S.Ct. 290, 38 L.Ed.2d 218 (1973); *Texas Gulf Sulphur Co. v. J.R. Simplot Co.*, 418

F.2d 793, 806 (9th Cir. 1969); *Continental Oil Co. v. Frontier Refining Co.*, 338 F.2d 780, 782 (10th Cir. 1964); *Anheuser-Busch, Inc. v. FTC*, 289 F.2d 835, 840 (7th Cir. 1961); *Balian Ice Cream Co. v. Arden Farms Co.*, 231 F.2d 356, 368 (9th Cir. 1955), *cert. denied*, 350 U.S. 991, 76 S.Ct. 545, 100 L.Ed. 856 (1956).

*Bowl-O-Mat, Inc.*, 429 U.S. 477, 487, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Thus, we must exercise great care in differentiating between legitimate price competition and that "predatory pricing" which constitutes a restraint of trade.[7]

While our court has been less than clear in formulating a succinct, definitive test to determine predatory pricing, we have recently given some general guidelines. In *Hanson v. Shell Oil Co.*, 541 F.2d 1352, 1358 (9th Cir. 1976), *cert. denied*, 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977), we stated:

> To demonstrate predation, Hanson had to show that the prices charged by Shell were such that Shell was foregoing present profits in order to create a market position in which it could charge enough to obtain supranormal profits and recoup its present losses.

Janich points to two areas where it contends there was sufficient evidence to go to the jury on this issue. Primarily, it relies on evidence showing that American had sold half gallons of gin and vodka below its cost for these items: gin from 1963 to 1968 and vodka from 1964 to 1968.

■ But Janich has failed to meet its burden of proof of predatory pricing of the half gallons. Where, as here, a company sells goods in different sizes, it is necessary to determine what is the "product" which is allegedly being sold at a predatory price. The central question is whether liquor sold in different sizes of containers involves separate products.

■ In this case, several factors suggest that the half gallon alone does not constitute a separate product. The relevant product must be defined with reference to the danger posed by predatory pricing. Pricing is predatory only where the firm foregoes short-term profits in order to develop a market position such that the firm can later raise prices and recoup lost prof-

its, *Areeda & Turner, supra*, 88 Harv.L.Rev. at 698–99; *see Hanson v. Shell Oil Co., supra*, 541 F.2d at 1358; *International Air Ind., Inc. v. American Excelsior Co., supra*, 517 F.2d at 723. Therefore, the product must be such that if predatorily priced, rivals are likely to be driven out of the market or excluded, allowing the firm to raise prices.

Chain retailers tend to buy gin and vodka either in a full line of sizes or only in the most popular sizes. When they buy the full line, they doubtless compare prices in terms of the overall price structure. The pricing of one size at a predatory level would not necessarily drive out rivals who were selling a full line, as is the case in this industry, unless this placed the overall price of the line at the predatory level. Yet there was no evidence that the entire line was so priced for the years in question.

It is possible that a given size might be so significant that a chain retailer would select the overall line on the basis of that size. However, half gallons were a small part of American's business in the early 1960's, constituting only 1% of total case sales in fiscal year 1962 and extending up to 4.6% of case sales in fiscal year 1967. Since American was prepared to supply a complete line of different sizes to its customers if they desired, that the chain stores must have bought half gallons in comparatively small amounts. Because of this, we may conclude that a predatory price set for half gallons would not be likely to drive out or exclude rivals from sales of the product line as a whole, in the absence of predatory pricing in other sizes.

Even where the chain retailers buy less than the whole line, the evidence indicates that they emphasize purchases of fifths and quarts. Therefore, a predatory price for half gallons alone would not tend to drive out or exclude rivals.

---

7. As we have stated on another occasion, "[t]he antitrust laws were not intended, and may not be used to require businesses to price their products at unreasonably high prices (which penalize the consumer) so that less effi-cient competitors can stay in business. The Sherman Act is not a subsidy for inefficiency." *Hanson v. Shell Oil Co.*, 541 F.2d 1352, 1358–59 (9th Cir. 1976), *cert. denied*, 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977).

Thus, while we do not hold that a single size in a product line may never be a product for purposes of predatory pricing, based upon the facts of this case, half gallons of gin or vodka do not constitute a separate product for the years in which they were allegedly predatorily priced.

The remaining record pertaining to alleged predatory pricing is even less persuasive. Janich produced evidence at trial that American had a price list effective for the period from August 1, 1961 to May 1, 1962, which included a 2000–case discount price for the full line of 80 proof gin and vodka that was below American's cost for these goods, particularly when freight charges were properly recalculated. But it is far from clear from the record that products were actually sold at these prices. In addition, the district judge found a total absence of evidence showing the prices at which other distillers, rectifiers or wholesalers were selling comparable products during the time the price list was allegedly in effect. Thus, Janich failed to show that the price list was evidence of any wrongful behavior by American.

Even if the price list were proven relevant, we fail to see how that evidence would be sufficient to go to the jury. We did indicate in *Hanson* that predatory pricing "could be shown by evidence that Shell was selling its gasoline at below marginal cost or, because marginal cost is often impossible to ascertain, below average variable costs." 541 F.2d at 1358. To determine whether Janich's price list evidence can qualify, we must consider the terms used.

As implied in *Hanson*, an across-the-board price set at or above marginal cost [8] should not ordinarily form the basis for an antitrust violation. First, a firm setting its price equal to marginal cost will injure other firms more than it will injure itself only if the others are less efficient. More efficient firms will be losing less or even operating profitably. Second, a rule requiring a firm to increase its price above marginal cost in order to avoid a charge of illegal conduct would operate to reduce production, causing a loss of output which could be produced at a cost equal to or lower than its value to consumers.[9] For both reasons, therefore, "pricing at marginal cost is the competitive and socially optimal result." *Areeda & Turner, supra*, 88 Harv.L.Rev. at 711.

At the same time, pricing below marginal cost is socially wasteful. A seller who sets his price below marginal cost will be producing goods at a cost which is greater than

---

8. The firm's marginal cost "is the increment to total cost that results from producing an additional increment of output." *Areeda & Turner, supra*, 88 Harv.L.Rev. at 700.

9. In economic analysis, the marginal cost of a good is construed as the cost to society of that good, for its production requires resources which could be used in the production of other goods. The price which people are willing to pay to obtain the good is construed as the social value of the good. However, different people have different limits on the amount they are willing to pay to obtain the good. As prices decline more people are willing to buy. For a firm to sell more goods, prices must be reduced.

As a matter of short-run economic welfare, it is beneficial to increase production and lower prices so long as price exceeds marginal cost. In other words, so long as there are people who are willing to pay an amount for the good which is above its marginal cost, it is socially beneficial to continue to increase production. Of course this will require a continued reduction in prices in order to sell the full amount

produced. Thus, social welfare is maximized in the short run at that production level where the price of the good equals its marginal cost. Where the firm raises its price above marginal cost, it will not be able to sell as many goods and will have to reduce production. Where this occurs, there is a loss to society of all that additional output which the firm could produce by lowering its price to marginal cost and producing at the welfare maximization level. *See* F. Scherer, Industrial Market Structure and Economic Performance 15–19 (1970).

This analysis is based upon short-run welfare maximization. In the long run there are complications. *See* Scherer, *Predatory Pricing and the Sherman Act: A Comment*, 89 Harv.L.Rev. 869, 883–89 (1976). However, long-run economic welfare consequences are "intrinsically speculative and indeterminate" and, in considering the limitations of the judicial process, are properly disregarded in formulating a test for predatory pricing. *Areeda & Turner, Scherer on Predatory Pricing: A Reply*, 89 Harv.L. Rev. 891, 896–97 (1976).

their value to consumers.[10] In addition, setting prices below marginal cost greatly increases the possibility that rivalry will be extinguished or prevented for reasons unrelated to the efficiency of the price-setting firm. Accordingly, setting prices below marginal cost may well form the basis for an antitrust violation.

■ However, a firm's marginal costs cannot be ascertained from conventional business records. Conventional records do provide information which a jury can use as evidence of marginal cost. Average variable cost[11] is likely to approximate marginal cost. *Areeda & Turner, supra*, 88 Harv.L. Rev. at 700 n.13, 716–17 & n.42. Thus, as stated in *Hanson*, average variable cost can be used as evidence of marginal cost.

■ By introducing the alleged price list, Janich did not produce evidence that American's prices were below its average variable costs. The cost referred to in the list was "cost of merchandise sold." However, cost of merchandise sold is not the equivalent of average variable cost. Cost of merchandise sold is an accounting formula used by American to meet the requirements of the Securities and Exchange Commission. It includes costs of spirits and bottling supplies, direct labor costs, indirect labor costs, depreciation on the plant, real estate and personal property taxes, bonds and licenses, and warehousing and shipping costs. Some of these items are not variable costs; that is, some are costs which do not vary with output. While materials, direct labor, indirect labor, and warehousing and shipping costs are costs which vary with output, plant depreciation, real estate and personal property taxes, and business li-

censes are considered to be fixed costs because they do not vary with output. Thus, a price which is below "cost of merchandise sold" is not necessarily below average variable cost.

If the items involving fixed costs could be subtracted from "cost of merchandise sold," only variable costs would remain and it would be possible to arrive at a proper measure of cost for purposes of this action. In American's cost study, however, items of fixed cost were intermingled with certain items of variable cost in the general category of overhead. Items of fixed cost cannot be separated out. Thus, with the record in its present state, it is not possible to determine if American's 1961–62 listed prices for gin and vodka were below average variable cost.

■ Because Janich bears the burden of proof in establishing its attempted monopolization claim, *see Hallmark, supra*, 489 F.2d at 13, it bears the burden of showing each element of that claim—including predatory conduct. On the basis of the present record, and even assuming that the products were sold at the prices indicated on the price list, Janich has not come forth with sufficient evidence to go to the jury on a contention that American sold gin and vodka below average variable cost for the period 1961–62.

In summary, we hold that the district court was correct in concluding that Janich did not produce sufficient evidence to go to the jury on the question of whether American had engaged in predatory pricing in a product line in either gin or vodka. The evidence concerning the full line of gin and vodka in 1961–62 was deficient as to actual

---

10. *See* note 9 *supra*.

11. Variable costs . . . are costs that vary with changes in output. They typically include such items as materials, fuel, labor directly used to produce the product, indirect labor such as foremen, clerks, and custodial help, utilities, repair and maintenance, and per unit royalties and license fees. The average variable cost is the sum of all variable costs divided by output.

*Areeda & Turner, supra*, 88 Harv.L.Rev. at 700.

Average variable cost is sometimes construed as including only costs of production. When this is the case, sales costs and costs of warehousing and transportation for outgoing goods are analyzed separately. *See, e. g.*, F. Scherer, The Economics of Multi-Plant Operation 21 (1975). For purposes of this analysis, however, these costs should also be treated as variable if they are charged on the firm's books as direct expenses rather than investment for purposes of depreciation and tax. *Areeda & Turner, supra*, 88 Harv.L.Rev. at 720 & n. 48, 728.

sales and, in addition, the evidence of prices which were below the cost of merchandise allegedly sold for the items in question was inadequate to demonstrate that the prices were below average variable cost. With respect to the evidence concerning prices of half gallons between 1963 and 1968, half gallons do not constitute a product line for the years in question. Thus, without reaching the issue of whether the specified acts could form the basis of a substantial claim of restraint of trade, we conclude that on these facts no reasonable jury could determine that American was engaging in predatory pricing. Consequently, insofar as the attempt to monopolize claim was founded on predatory pricing, a directed verdict against Janich was proper.

II. *Direct Evidence of Specific Intent*

In addition to presenting evidence of alleged predatory pricing (element 2) in order to sustain an inference of the other two elements of attempted monopolization, Janich also sought to present direct evidence on the issue of American's specific intent to monopolize (element 1). The evidence offered but rejected was testimony by Mr. Moise Silber. Silber would have testified that he was told by Mr. Roy Sherwin, a former salesman for American, that Sherwin and Mr. Buck, the executive vice-president of American, had engaged in several conversations over the years during the course of which Buck had stated that American was going to lower the prices on gin and vodka in California, run the rectifiers out of business and then increase prices.

■ American objected and the court excluded the testimony on the grounds that, although Buck's statements could be admitted into evidence as an admission by a party opponent, the statements made by Sherwin to Silber were incurable hearsay. We agree that the statements were hearsay and that there was no exception to the hearsay rule under which Sherwin's statement could be admitted into evidence.

■ Janich argues that Sherwin's alleged statement "served to identify him as a participant in civil and criminal wrong-doing" and therefore was a declaration against interest under California Evidence Code § 1230 and the Proposed Federal Rules of Evidence 804(b)(4), reprinted at 56 F.R.D. 183, 321.[12] However, there are certain foundational requirements for the declaration against interest exception to the hearsay rule. Among these is the requirement that the declarant must be shown to be unavailable. Cal.Ev.Code § 1230, Proposed Fed.R.Evid. 804(b)(4). In this case, counsel for Janich made conclusory allegations that Sherwin was outside the jurisdiction of the court. This is inadequate. Under California law, " 'unavailable as a witness' means that the declarant is . . . [a]bsent from the hearing and the proponent of his statement has exercised reasonable diligence but has been unable to procure his attendance by the court's process." Cal.Ev.Code § 240(a)(5). There was no evidence that Janich exercised diligence in attempting to procure the presence of Sherwin. *See People v. Linder*, 5 Cal.3d 342, 96 Cal.Rptr. 26, 486 P.2d 1226 (1971); *People v. Beyea*, 38 Cal.App.3d 176, 113 Cal.Rptr. 254 (1974). Thus, the declaration against interest exception was not available under California law.

---

**12.** At the time of trial, prior to the adoption of the Federal Rules of Evidence, admission of evidence in civil cases was governed by Fed.R. Civ.P. 43(a), which provided in part:

All evidence shall be admitted which is admissible under the statutes of the United States, or under the rules of evidence heretofore applied in the courts of the United States on the hearing of suits in equity, or under the rules of evidence applied in the courts of general jurisdiction of the state in which the United States court is held.

The clause that evidence is admissible "under the rules of evidence heretofore applied in the courts of the United States on the hearing of suits in equity" was interpreted to mean that the federal rule could be deduced from general principles and related federal decisions although there was no stated equity principle available. C. Wright, Federal Courts § 93, at 457 (3d ed. 1976); *see New York Life Ins. Co. v. Harrington*, 299 F.2d 803, 808 (9th Cir. 1962). Thus, if he chose, the trial judge could consider the Proposed Federal Rules of Evidence in his evaluation of general principles.

Under federal law the result does not differ.[13] The Proposed Federal Rules of Evidence provided, at the time of trial in 1974, that " 'unavailability as a witness' includes situations in which the declarant: . . . [i]s absent from the hearing and the proponent of his statement has been unable to procure his attendance by process or other reasonable means." Proposed Fed. R.Evid. 804(a)(5).

Janich also argues that the Sherwin statements were admissible as statements of a co-conspirator under Cal.Ev. Code § 1223. However, § 1223 is applicable only if certain requirements are met, including the following: (1) the statement was made by the declarant while he was participating in a conspiracy to commit a crime or a civil wrong; (2) the statement was made in furtherance of the objectives of that conspiracy; and (3) the statement was made by the declarant prior to or during the time that such party also was participating in that conspiracy. Cal.Ev.Code § 1223. Janich failed to show participation by Sherwin in any form of conspiracy. Moreover, Janich made no attempt to show that Sherwin's alleged declaration was in furtherance of the objective of a conspiracy. Thus, the admission of a co-conspirator exception was not available.

Finally, Janich argues that Sherwin's statement was admissible for such non-hearsay purposes as to show the orders of a superior, American's pattern of doing business, and its motive and intent. Upon a review of the record, we disagree. Moreover, even if the statement would have been probative on these matters, there is some question about the trustworthiness of the offered hearsay. Silber testified that Buck would lose his temper on occasion and that he was an eccentric man. Silber testified that Sherwin was a man who "loved himself" and who tried to make himself seem important to others. Considering the questions of trustworthiness, the trial judge could have properly concluded that the probative value of the hearsay testimony was substantially outweighed by danger of unfair prejudice. Cal.Ev.Code § 352, Proposed Fed.R.Evid. 403, 56 F.R.D. 183, 218.

### III. *Other Allegations of Error*

Janich also alleges that the trial court erred in instructing the jury during plaintiff's summation that it should not consider American's action in filing and failing to prosecute its counterclaim as evidence of anti-competitive intent. The court ruled that the pleadings were not in evidence because they were superseded by a pre-trial order. Although the docket indicates the entering of a pre-trial order, such an order was not included in the record on appeal. The filing of the counterclaim and the failure to prosecute were not in evidence, however, for reasons unrelated to the pre-trial order.

Statements made in a pleading may be admitted against the pleader as evidence in the form of judicial admissions without the introduction of the pleadings. 4 Wigmore, Evidence § 1064 (Chadbourn rev. 1972); *but see* McCormick, Evidence § 265 (2d ed. 1972). Nevertheless, in this case it was not statements made in the counterclaim but the very filing of the counterclaim and the failure to prosecute which were the evidentiary facts. Janich never brought this information to the attention of the jury during its presentation of evidence. As a result, American was never afforded the opportunity to present explanatory evidence. We conclude that the filing of the counterclaim and the failure to prosecute this claim were not in evidence. Thus, Janich is foreclosed by the well-settled rule that it is improper in closing argument to make reference, over objection, to matters not in evidence. *Musgrave v. Union Carbide Corp.*, 493 F.2d 224, 231 (7th Cir. 1974).

Janich also alleges that the court erred in instructing the jury during its summation that there was no evidence in the record that sales of gin and vodka by Lewis Westco, a competitor of American's, were

---

**13.** *See* note 12 *supra*.

below cost. While the record is somewhat ambiguous on this point, we feel that the court did err, for there was evidence that Lewis Westco had been charged by the California Department of Alcoholic Beverage Control with below-cost pricing. Although the hearing examiner had held in favor of Lewis Westco, the department director had reversed. Although the director's decision had been appealed, the decision constituted some evidence that Lewis Westco was engaged in below-cost pricing according to the standards used by the control board.

While there was error, we do not believe that the district judge's ruling was prejudicial. Janich argues that Lewis Westco's below-cost pricing shows the anti-competitive effect of American's pricing. We disagree. There was no evidence concerning the circumstances surrounding the incident with which Lewis Westco was charged. Nor was there evidence concerning the extent of Lewis Westco's below-cost pricing in terms of product, time or price. Because there was no proof of any causal connection between American's pricing policies and Lewis Westco's below-cost pricing, the evidence, even if admitted, would have been insufficient to show that American's pricing had an adverse effect on competition. Thus, the ruling of the district judge was harmless error; it could not have prejudiced Janich's substantial rights. Fed.R. Civ.P. 61; see *Hallmark Industry v. Reynolds Metals Co.,* supra, 489 F.2d at 14; *United States v. Heyward-Robinson Co.,* 430 F.2d 1077, 1083 (2d Cir. 1970), *cert. denied,* 400 U.S. 1021, 91 S.Ct. 582, 27 L.Ed.2d 632 (1971).

■ Janich next alleges that the court erred in overruling Janich's motion to strike certain testimony of Sanford Coplin, the president of Lewis Westco, who was a witness for Janich. Janich had been questioning Coplin concerning Lewis Westco's pricing. Coplin had testified that American's prices to Safeway during 1972 were lower than its regular posted price. Coplin also testified that this had resulted from the low prices which Lewis Westco was charging to Lucky Stores. In reaction to this, Janich's counsel asked the following question:

You mean that there is some differential between prices posted by American for sales to Safeway and the price being charged by American for sales of gin and vodka to Safeway?

In response, Coplin stated as follows:

Well, in the State of California you have the right of competitive filing, which allows a seller of distilled spirits to meet the lowest price charged in the industry without being in jeopardy of selling below costs.

Janich immediately moved to strike the answer on the ground that it stated a legal conclusion, and that it was non-responsive and volunteered. The motion was denied. Considering the prior testimony, we believe that the answer was responsive. Coplin was giving his understanding of the law as an explanation for the price differential. Immediately after denying Janich's motion, the district judge instructed the jury that it was not to accept the witness's statement as a correct description of the law, but only as a statement of the witness's understanding. The judge added that if California law was applicable to any issue in the case, the court would give a statement of the law to the jury. Thus, the judge dispelled any danger that the jury would apply Coplin's interpretation of the law in its deliberations.

Janich also alleges that the district judge erred in continuously commenting upon, adding to and summarizing evidence to the prejudice of the plaintiff. Upon a full review of the record, we have determined that the trial judge carried out his responsibilities in a fair and impartial manner. There is no indication that Janich was subject to prejudicial treatment.

■ Finally, Janich alleges two errors in the jury instructions for the Robinson-Patman claim concerning damages. It alleges that the district judge erred in instructing the jury that the theory of damages in antitrust cases is not to recoup unlawfully gained profits. It also alleges that the court erred in instructing the jury that Janich's damages would be trebled if the

jury held in its favor. However, we need not determine whether these instructions constituted error because the jury never reached the issue of damages. It decided against Janich on the specific ground that American's differential pricing did not have the requisite anti-competitive effect to constitute a violation of the Robinson-Patman Act. Upon a review of the record, we have determined that this finding is supported by the evidence. Because the jury's determination necessarily meant that American had no liability, any error in instructions concerning damages was not prejudicial. *Sulmeyer v. Coca Cola Co.*, 515 F.2d 835, 852 (5th Cir. 1975), *cert. denied*, 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 341 (1976).

We have carefully reviewed the remaining issues which Janich raises. We find that they are without merit.

AFFIRMED.