4 F.3d 682
 62 USLW 2216, 1993-2 Trade Cases 70,355
 Gerhard FLEGEL, D.O.; Richard Still, D.O., Appellants,
v.
CHRISTIAN HOSPITAL, NORTHEAST-NORTHWEST; Michael R.
Richmond; Robert P. Margolis; Richard A. Blath; Donald A.
Blum; Wilfrido C. Feliciano; Richard J. Kloecker; Stephen
N. Bell; Clarence M. Benage; Leon Bialecki; Alan C.
Craig; Godofredo M. Herzog; James Debnam; Barbara Ellzey;
Joshua Jensen; Loretta May Roberts; Arturo C. Montes;
David M. Near; Edward A. Puro; Sanford E. Rabushka; John
L. Rollo; William P. Svancarek; Alan F. Tess; Thomas J.
Banton, Jr.; Mariano N. Floro, Jr.; Robert H. Halley;
William F. Hoffman; Gerald W. Moritz; Gerald Newport;
Sharad P. Parikh; Ebello T. Pasia; Thomas E. Shine;
George T. Shuert; Mardonio J.R. Yap; Yoram Hahn; Carl S.
Ingber; David Landau; Michael Matar; Thomas E. Ryan;
Ivan W. Sletten; Mark L. Travis; Gloria Wattler; William
E. Dreyer; Paul J. McKee; Ned Taddeucci; Arthur J.
Seewoester; Leo I. Mirowitz; Arnold J. Millner; David
M. Margolis; Mary J. Lee; Leonard R. Kostecki; Paul
Kohnen; Gerry Kamenko; Paul F. Detrick; Fred L. Brown;
Peter W. Callow, Appellees.
 No. 92-3773.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 16, 1993.
Decided Sept. 14, 1993.
Rehearing Denied Oct. 14, 1993.
 
 Steven M. Hamburg, St. Louis, MO, argued (Theresa Counts Burke, on the brief), for appellants.
 Glenn E. Davis, St. Louis, MO, argued (Richard Scherrer and Ann E. Buckley on the brief), for appellees.
 Before BOWMAN, Circuit Judge, HEANEY, Senior Circuit Judge, and BEAM, Circuit Judge.
 HEANEY, Senior Circuit Judge.
 
 
 1
 Gerhard Flegel and Richard Still, doctors of osteopathy (D.O.s) who were denied privileges at Christian Hospital Northeast-Northwest, sued the hospital and a number of its board members, employees, and staff physicians for antitrust violations in the United States District Court for the Eastern District of Missouri. Flegel and Still alleged that the hospital and its staff had conspired to prevent them from having access to the market of patients who would otherwise have been referred to them had they been granted privileges. The defendants moved for summary judgment, arguing, inter alia, that Christian lacked sufficient market power within a properly defined relevant market for an antitrust violation to have occurred. The district court granted the defendants' motion in an order from which Flegel and Still have appealed. We affirm.
 
 
 2
 * Christian is a private, not-for-profit hospital that operates from two locations in North St. Louis County, Missouri.[1] The hospital has 565 physicians on staff, fifty of whom are D.O.s.
 
 
 3
 Flegel and Still sought to add to those numbers by becoming the first osteopathic urologists on the hospital's staff. They filed applications for privileges at Christian in the fall of 1988. Both applications underwent numerous levels of review and both were eventually denied. Although the stated reasons for those decisions have changed somewhat before and during the course of this litigation, Christian now claims that both decisions rested on inadequate specialty and subspecialty training, and some contemporaneous evidence supports that assertion.
 
 
 4
 At the time of their applications, both Flegel and Still were certified in urologic surgery by the American Osteopathic Association (AOA). Certification by the AOA required completion of a four-year training program, which could be comprised of two years in general surgery and two years in urologic surgery, as was the case with both Flegel and Still. The hospital found their training inadequate in that certification by the American Board of Medical Specialties (ABMS), the allopathic equivalent to the AOA, required three years of training specifically in urologic surgery.
 
 
 5
 Shortly after Flegel and Still filed their applications, the hospital's department of surgery revised its guidelines to require that applicants either be certified or eligible to be certified by the ABMS. Previously, applicants could receive privileges if they were certified either by the ABMS or by the AOA. The hospital asserts that it took this action to increase the quality of care within the department, to improve the department's reputation, and to respond to recommendations made by hospital accrediting organizations such as the Joint Commission for Accreditation of Hospital Organizations. In addition to receiving three years of subspecialty training, the ABMS requires that such training take place in a program accredited by the Accreditation Council for Graduate Medical Education (ACGME). The district court found that positions in such programs can be extremely difficult to attain for D.O.s. Neither Flegel nor Still attended an ACGME-accredited training program.
 
 II
 
 6
 Flegel and Still alleged three separate violations of the federal antitrust laws:
 
 
 7
 (1) the defendants combined and conspired with one another to illegally boycott the plaintiffs from obtaining hospital staff privileges in violation of section one of the Sherman Act, 15 U.S.C. Sec. 1;
 
 
 8
 (2) the defendants entered into a combination and conspiracy in unreasonable restraint of trade and commerce in violation of section one of the Sherman Act, 15 U.S.C. Sec. 1; and
 
 
 9
 (3) the defendants entered into a contract, combination, or conspiracy to unlawfully prevent plaintiffs from obtaining active staff privileges at the hospital in violation of section two of the Sherman Act, 15 U.S.C. Sec. 2.
 
 
 10
 See Flegel, 804 F.Supp. at 1167.[2] By alleging an illegal boycott, the plaintiffs sought to prove a per se violation, but the district court found the per se analysis inapplicable and instead applied the so-called "rule of reason" to the remaining claims.
 
 
 11
 Our discussion proceeds as follows: after concluding that the alleged restraint is subject to the rule of reason rather than per se analysis, we consider whether the plaintiffs have provided sufficient evidence of actual detrimental effects on competition to obviate the need for a more detailed market analysis. Finding that they have not, we then consider the relevant geographic market definitions proposed by Flegel and Still, and the evidence of Christian's power within the appropriate market. Because plaintiffs have produced little evidence to support their assertion that Christian possesses dominant market power, we affirm the district court's grant of summary judgment to the defendants on that ground.[3]
 
 
 12
 In reviewing a grant of summary judgment, we apply the same standard as does the district court, and we view the evidence most favorably to the nonmovant, granting all reasonable inferences in the nonmovant's favor as well. See Amerinet, Inc. v. Xerox Corp., 972 F.2d 1483, 1489-90 (8th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1048, 122 L.Ed.2d 356 (1993). "In complex antitrust cases, no different or heightened standard for the grant of summary judgment applies." Id. at 1490. When neither motive nor intent are determinative, summary judgment may be particularly useful. See id.
 
 
 13
 In this case, neither motive nor intent are determinative. Although the district court found that the hospital treated M.D.s and D.O.s alike, applying the same standards to each, our analysis rests on no such assumption. Rather, we assume for the purposes of our decision that a jury could reasonably find that the hospital discriminated against Flegel and Still because they were osteopaths. We nonetheless hold that a jury could not reasonably find that the hospital's conduct amounted to an antitrust violation.
 
 
 14
 * Flegel and Still first assert that the actions of the defendants that led the hospital to deny privileges to both of them amounted to a group boycott subject to per se analysis under section one of the Sherman Act.
 
 
 15
 [A] restraint may be adjudged unreasonable either because it fits within a class of restraints that has been held to be "per se" unreasonable, or because it violates what has come to be known as the "Rule of Reason," under which the "test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition."
 
 
 16
 FTC v. Indiana Fed'n of Dentists, 476 U.S. 447, 457-58, 106 S.Ct. 2009, 2017, 90 L.Ed.2d 445 (1986) (quoting Chicago Bd. of Trade v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918)) (IFD ). If an alleged restraint falls within the category of restraints subject to per se analysis, a plaintiff need not prove its anticompetitive effects.
 
 
 17
 The courts of appeals have generally examined the denial or revocation of hospital privileges under the rule of reason, see, e.g., Oksanen v. Page Memorial Hosp., 945 F.2d 696, 708-09 (4th Cir.1991) (en banc), cert. denied, --- U.S. ----, 112 S.Ct. 973, 117 L.Ed.2d 137 (1992); Bhan v. NME Hosp., Inc., 929 F.2d 1404, 1411-12 (9th Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 617, 116 L.Ed.2d 639 (1991); Oltz v. St. Peter's Community Hosp., 861 F.2d 1440, 1445 n. 1 (9th Cir.1988); Goss v. Memorial Hosp. Sys., 789 F.2d 353, 354-55 (5th Cir.1986), but Flegel and Still argue that these cases have involved individual determinations of incompetence or unprofessional conduct rather than exclusion of a class of medical service providers such as D.O.s. The plaintiffs direct our attention to Weiss v. York Hosp., 745 F.2d 786 (3d Cir.1984), cert. denied, 470 U.S. 1060, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985), in which York Hospital was alleged to have engaged in "strict scrutiny" of all applications by D.O.s for privileges, a practice that often resulted in decisions to deny privileges, while essentially rubber-stamping applications by M.D.s. See id. at 795. The district court had instructed the jury that this practice was subject to a per se analysis, and the Third Circuit agreed:
 
 
 18
 The Medical Staff is ... entitled to exclude individual doctors, including osteopaths, on the basis of their lack of professional competence or unprofessional conduct. If York's policy toward D.O.'s could be viewed as a form of industry self-regulation of this type, the rule of reason, rather than a per se rule, would be applicable. We recognize, therefore, that in many cases involving exclusion from staff privilege, courts will ... have to utilize a rule of reason balancing approach. This case is different, however, because York has not contended that osteopaths as a group are less qualified than M.D.s. In the absence of such a contention, or another legitimate explanation for the discrimination, we conclude that a per se rule should be applied, since the effect of the practice is identical to that of the traditional boycott, and plainly anticompetitive.
 
 
 19
 Id. at 820 (citations and footnote omitted).
 
 
 20
 Christian counters that the Weiss decision is unpersuasive because it precedes the Supreme Court's decisions in Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co., 472 U.S. 284, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985), and IFD, in which the Court indicated a reluctance to expand the category of group boycotts to which per se analysis should be applied:
 
 
 21
 [T]he category of restraints classed as group boycotts is not to be expanded indiscriminately, and the per se approach has generally been limited to cases in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor.... Moreover, we have been slow ... to extend per se analysis to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious.
 
 
 22
 IFD, 476 U.S. at 458-59, 106 S.Ct. at 2018 (citation omitted). In both cases the Court held per se analysis inapplicable, and the defendants urge us to do likewise in this case.
 
 
 23
 The plaintiffs' arguments fail in two respects: first, their assertion that all relevant decisions other than Weiss have involved individualized determinations of incompetence or unprofessional conduct is incorrect; and second, even under the Weiss court's reasoning, the rule of reason should be applied to this case.
 
 
 24
 Although several of the relevant decisions by the courts of appeals have involved individualized denial or revocation of privileges, that cannot be said of all such cases. Two relevant decisions by the Ninth Circuit, Bhan and Oltz, involved the exclusion of registered nurse anesthetists in favor of M.D. anesthesiologists. The Bhan court's analysis applies with equal force to this case:
 
 
 25
 [O]nly certain boycotts are unlawful per se. Nonetheless, the distinction between boycotts that are and those that must be tested under the rule of reason is less than crystal clear. See Northwest Stationers, 472 U.S. at 294 [105 S.Ct. at 2619]. The line can best be drawn, however, by following the analysis used to separate per se and rule of reason cases in general. Thus, the per se rule should be invoked for a group boycott when the challenged activity would almost always tend to be predominantly anti-competitive. See [id.] at 298 [105 S.Ct. at 2621].
 
 
 26
 The practice of which Bhan complains can be cast in the following general terms: physicians conspiring with a hospital to allow only physician, rather than nonphysician, providers to offer services in a particular area. As a result, the hospital eliminates a class of providers.
 
 
 27
 This activity does not appear to be one that is always anti-competitive. On the one hand, hospitals must make choices about the types of qualifications a practitioner must have to apply for staff privileges in various fields of practice. See [Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 30, 104 S.Ct. 1551, 1567, 80 L.Ed.2d 2 (1984) ] (commenting that hospitals have an unquestioned right to exercise control over staff privileges). These restrictions help it provide more efficient, higher quality services in order to compete against other hospitals. 6 J. von Kalikowski, Antitrust Laws & Trade Regulation Sec. 52.03, at 52-45 (1990). This also reduces its malpractice exposure. Thus, the choice of physician over nonphysician providers may actually sharpen competition by making [the hospital] a more attractive competitor in the patient market.
 
 
 28
 On the other hand, a plaintiff may be able to establish in a certain situation that the physicians are conspiring to drive the nurses out of business because their services are just as good but cheaper. The hospital may be shown to be acceding to the doctors' wishes because of its wish to retain certain of the doctors' services. In that case, the practice of excluding nonphysician providers as a class would appear to be anti-competitive.
 
 
 29
 In sum, the practice of excluding nonphysicians in favor of physicians is not one that always would have an anti-competitive effect. Given that the effect of the practice is unclear, it is appropriate to apply the rule of reason.
 
 
 30
 Bhan, 929 F.2d at 1412 (citation, footnotes, and parallel citations omitted).
 
 
 31
 Even under the reasoning of Weiss, the restraint alleged in this case is properly subject to the rule of reason. The Weiss court relied in part on York's failure to argue that D.O.s were in any way less qualified than M.D.s. Although Christian has not argued that D.O.s as a class are less qualified, they do argue that those whose subspecialty training is inadequate (not equivalent to that required by the ABMS) are less qualified. The exclusion from staff privilege in this case arguably falls within the category the Weiss court labeled "industry self-regulation" and is consequently not appropriate for per se analysis.
 
 
 32
 Having found per se analysis inapplicable to the alleged restraint, we now turn to a more detailed inquiry under the rule of reason.B
 
 
 33
 To determine the legality of a restraint of trade under the rule of reason, one must focus on the detrimental effects to competition, often by defining the relevant market and considering evidence of the defendant's power within that market. See Capital Imaging Assoc., P.C. v. Mohawk Valley Medical Assoc., Inc., 996 F.2d 537, 546 (2d Cir.1993). This is not always necessary, however.
 
 
 34
 Since the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, "proof of actual detrimental effects, such as a reduction of output," can obviate the need for an inquiry into market power, which is but a "surrogate for detrimental effects."
 
 
 35
 IFD, 476 U.S. at 460-61, 106 S.Ct. at 2019 (quoting 7 Phillip Areeda, Antitrust Law p 1511, at 429 (1986)). Either showing--market power or actual detrimental effects--shifts the burden to the defendant to demonstrate pro-competitive effects.[4] "The plaintiff, driven to this point, must then try to show that any legitimate objectives can be achieved in a substantially less restrictive manner," and the court then weighs "the harms and benefits to determine if the behavior is reasonable on balance." Bhan, 929 F.2d at 1413.
 
 
 36
 * Flegel and Still allege a reduction in the quality of care at Christian as proof of actual detrimental effects on competition that have resulted from the hospital's refusal to grant them privileges. They rely on affidavits of D.O.s in general practice (GPDOs) at Christian who assert that their patients would receive better care if treated by Flegel and Still rather than by M.D. urologists. The gist of these assertions is that the quality of communication between the GPDOs and the M.D. urologists is lower than it would be between the GPDOs and Flegel and Still.[5] Although the proper perspective on the quality of competition is that of the consumers (in this case, the patients), Flegel and Still argue that the GPDOs are "agents" of the patients in their decisions regarding providers of urological services and consequently the GPDOs' perspectives represent those of the affected patients.
 
 
 37
 Regardless of the merit of the GPDOs' assertions, the plaintiffs have presented insufficient evidence of actual detrimental effects on competition to avoid the need to prove market power. We find too little evidence in this case, just as the Supreme Court found insufficient evidence that the exclusive contract for anesthesiologists' services in Jefferson Parish was predominantly anticompetitive:
 
 
 38
 There is ... insufficient evidence in this record to provide a basis for finding that the [exclusive anesthesiologists'] contract, as it actually operates in the market, has unreasonably restrained competition. The record sheds little light on how this arrangement affected consumer demand for separate arrangements with a specific anesthesiologist. The evidence indicates that some surgeons and patients preferred respondent's services to those of [the exclusive providers], but there is no evidence that any patient who was sophisticated enough to know the difference between two anesthesiologists was not also able to go to a hospital that would provide him with the anesthesiologist of his choice.
 
 
 39
 Jefferson Parish, 466 U.S. at 29-30, 104 S.Ct. at 1567 (footnotes omitted). The Court anticipated the plaintiffs' arguments that patients rely on the GPDOs to select their urologists, and responded that "[i]f, as is likely, it is the patient's doctor and not the patient who selects an anesthesiologist, the doctor can simply take the patient elsewhere if he is dissatisfied with [the exclusive providers]," adding that the district court in that case had "found that most doctors in the area have staff privileges at more than one hospital." Id. at 30 n. 50, 104 S.Ct. at 1567 n. 50.
 
 
 40
 Similarly in this case, there has been no showing that those patients sophisticated enough to distinguish between M.D. urologists and D.O. urologists could not go to a hospital that would provide him or her with the urologist of choice. Plaintiffs assert that a number of patients are locked in to Christian but provide no evidence of this beyond mere assertion. Although they provide evidence that patients who live near the hospital tend to buy their care at Christian, we are unwilling to infer from this that these patients are somehow "locked in." Also as in Jefferson Parish, the affiant GPDOs generally have privileges at more than one hospital, and, according to the record, over ninety percent of the D.O.s at Christian share privileges with the plaintiffs at one or more hospitals. See 2 R. at 440-41 (37 of 41 non-hospital-based D.O.s share privileges with Flegel and Still at another hospital). No evidence was presented, however, that any of the GPDO affiants was so moved by the lower quality of care now available at Christian that he or she took a patient elsewhere in order to have that patient receive the services of Flegel or Still. In short, the evidence of reduction in quality is insufficient.[6] "Therefore, [the plaintiffs have] not made an adequate showing of detrimental effects to obviate the need to show that appellees possess market power sufficient to stifle competition." Capital Imaging, 996 F.2d at 546.
 
 2
 
 41
 To establish that the defendants have market power, Flegel and Still must show that the defendants have "a dominant market share in a well-defined relevant market." Assam Drug Co. v. Miller Brewing Co., 798 F.2d 311, 318 (8th Cir.1986). Relevant markets are defined in terms of both geography and product. See Baxley-DeLamar Monuments, Inc. v. American Cemetery Ass'n, 938 F.2d 846, 850 (8th Cir.1991). The product in this case is agreed to be urologists' services, but there is no agreement on the geographic market. Flegel and Still propose a market of targeted patients of osteopathic physicians at Christian, while the defendants assert that the St. Louis metropolitan area is the relevant geographic market. The question before us, then, is whether the plaintiffs have provided sufficient evidence from which a jury could reasonably find that Christian possesses market power within the relevant market. The plaintiffs argue that market determination is necessarily a question for the jury, but we disagree. Like any other issue, market definition is subject to summary judgment if the plaintiffs fail to provide sufficient evidence from which a jury could reasonably find in their favor. See Assam Drug, 798 F.2d at 317; see also Bhan, 929 F.2d at 1413 n. 9.
 
 
 42
 Flegel and Still provide virtually no evidence to support their market definition. Market power is, as indicated earlier, simply a surrogate for actual anticompetitive effects, which are themselves determined from the viewpoint of the consumer. Yet in their arguments about the proper market definition, Flegel and Still provide no evidence that patients view Christian as a market separate from the much larger market for urologists' services. Rather, it is only the urologists seeking referrals from the GPDOs who might so define a market.[7]
 
 
 43
 Perhaps anticipating difficulties with the Ninth Circuit decision in Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd., 924 F.2d 1484 (9th Cir.1991), the plaintiffs assert that they do not seek to define the market simply as "referrals," but rather from the consumers' viewpoint. In Morgan, Strand, the court indicated that although the plaintiffs proposed a market in "referrals," the actual market was in radiologists' services because "nothing in the record suggest[ed] that the referrals as such are ever sold." Id. at 1489. The court then held that the evidence presented by plaintiffs was insufficient to allow a jury reasonably to conclude that the defendants possessed market power: "Referral pattern evidence ignores the possibility that even if referral patterns are quite fixed, or exclusive among osteopathic physicians, or University physicians, there may still be competition for the patients, who are the product's ultimate consumers." Id.
 
 
 44
 Flegel and Still make quite clear, at least on appeal,[8] that their proposed geographic market does not consist of referrals from the GPDOs at Christian, but of those patients who would be available to them as customers at Christian. We find the distinction unavailing. "The proper market definition in this case can be determined only after a factual inquiry into the 'commercial realities' faced by consumers." Eastman Kodak Co. v. Image Tech. Servs., Inc., --- U.S. ----, ---- - ----, 112 S.Ct. 2072, 2076, 119 L.Ed.2d 265, 293-94 (1992) (quoting United States v. Grinnell Corp., 384 U.S. 563, 572, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966)). We acknowledge that the Supreme Court's holding in Kodak that a single manufacturer's aftermarket products may constitute a relevant market supports the possibility that a single hospital may constitute the relevant market. See also Virtual Maintenance, Inc. v. Prime Computer, Inc., 995 F.2d 1324, 1328-30 (6th Cir.1993) (holding that market defined by the demands of Ford Motor Company can constitute relevant market). Despite this legal possibility, a plaintiff is nonetheless required to present evidence from which a reasonable jury could find the existence of the proposed market, i.e., urological services needed by GPDOs' patients in a single hospital. In this, Flegel and Still have failed, leaving us to consider which market definition finds support in the record and Christian's role within such a market.
 
 
 45
 The alternative market definitions to be considered are either the St. Louis metropolitan area or St. Louis County--in either of which Christian possesses no more than fifteen percent of the market under any measurement, see Flegel, 804 F.Supp. at 1170-71--or North St. Louis County, defined as the area within the twelve zip codes surrounding Christian. Forty-one percent of the residents of the latter market buy their care at Christian. See 2 R. at 442-43.
 
 
 46
 Plaintiffs did not present North St. Louis County to the district court as a proposed geographic market, choosing to concentrate instead on restricting the market to Christian. See Plaintiffs' Memorandum in Opposition to Defendants' Joint Motion for Summary Judgment at 51-54 (1 R. at 198-201). Even if they had, there appears to be no evidence in the record regarding Christian's share of the product (urological services) within the proposed geographic market. Plaintiffs do not even present us with evidence of Christian's share of surgical services within North St. Louis County. Nor is there evidence that patients view this as a market, though there is evidence that Christian views it as its primary service area. The possibility of such a market definition seems to have only occurred to plaintiffs upon reading the affidavit of the defendants' economics expert, in which he indicates that even within this small (and in his view unrealistic) market, Christian does not possess market power, for none of the evidence they presented supports this market definition.
 
 
 47
 Were there further evidence of this geographic market and of Christian's share of urological (or even surgical) services within the market, summary judgment on the issue of market power might well be precluded. No such evidence has been presented, however, and no reasonable jury could find that Christian hospital possesses market power in urological services on the scant evidence that has been presented.
 
 C
 
 48
 In addition to the alleged restraint of trade in violation of section one of the Sherman Act, Flegel and Still asserted that the defendants had violated section two as well. To establish such a violation plaintiffs must first prove defendants' "possession of monopoly power in the relevant market." Grinnell, 384 U.S. at 570, 86 S.Ct. at 1704. Because plaintiffs' section one claim failed due to lack of evidence of market power, it follows that their section two claim is similarly deficient.
 
 III
 
 49
 In denying staff privileges to Flegel and Still, the hospital allegedly restrained trade in violation of section one of the Sherman Act. We hold that this restraint does not fall within the category of restraints subject to per se analysis, and that its actual effects have not been shown to be sufficiently anticompetitive to obviate the need for a showing that the defendants possess market power. We further hold that the plaintiffs have failed to provide evidence from which a jury could reasonably find that the defendants possess the market power necessary to commit violations of either section one or section two of the Sherman Act. Consequently, we affirm the order of the district court granting summary judgment to the defendants.
 
 
 
 [1]
 The recitation of facts relies heavily (often verbatim) on the district court's somewhat more detailed factual description, to which Flegel and Still have offered no relevant objection. See Flegel v. Christian Hosp., Northeast-Northwest, 804 F.Supp. 1165, 1168-71 (E.D.Mo.1992)
 
 
 [2]
 Flegel and Still also alleged several pendent state law violations over which the district court refused to exercise jurisdiction. Given our disposition of the federal antitrust claims, we likewise need not reach the state law claims
 
 
 [3]
 Our resolution of the issues presented in this case has made it unnecessary for us to reach all of the issues presented on appeal. Defendants argue that they are immune from antitrust liability under the Health Care Quality Improvement Act of 1986. The district court failed to reach this issue, and it is likewise unnecessary for us to address it. Although cognizant of a split between the courts of appeals on the question whether, as a matter of law, a conspiracy can be proven in a hospital privileges case, we decline to address that issue as well. See generally Julian O. von Kalinowski, Antitrust Laws and Trade Regulation Sec. 52.03[b][ii] (1993). Even were we to rule in the plaintiffs' favor on this issue, both as to the legal possibility and the sufficiency of their evidence, the defendants would still be entitled to summary judgment. We consequently leave resolution of this issue for an appropriate case
 
 
 [4]
 Such a showing could be made in a variety of ways, but it must consist of more than simple assertions. For example,
 [i]f a group of practitioners such as D.O.'s or family practitioners is excluded, the institution must demonstrate the procompetitive justification, persuading the factfinder that, from the totality of circumstances, the articulated procompetitive rationale is consistent with the overall conduct of the hospital. For example, a facility might be able to justify personnel restrictions as a marketing, image-building strategy--"our hospital only allows board-certified practitioners to use our facilities." But the institution, to prevail, would have to show active promotion of that policy in other areas (for example, through aggressive quality-monitoring programs) and active pursuit of an image-building campaign (for example, through advertising or other marketing initiatives). It would have to prove, to the satisfaction of the factfinder, that it was in fact pursuing its goals as a rational economic actor and that it could justify its conduct by reference to rational, procompetitive economic principles.
 James F. Blumstein & Frank A. Sloan, Antitrust and Hospital Peer Review, 51 Law & Contemp.Probs. 7, 61 (1988) (footnotes omitted).
 
 
 [5]
 Typical of the GPDOs' assertions on this point is Dr. Martin J. Roitman's:
 The denial of Plaintiffs Gerhard Flegel and Richard Still to the surgical staff at [Christian] has resulted in a lower quality of care being available for my patients, as the urologists to whom I must make referrals for patients admitted to the hospital or for patients who seek hospitalization for urologic treatment at [Christian] do not generally provide me an opportunity to continue my participation at a preferred level in that patient's care, and Plaintiffs Flegel and Still provide a higher quality of urological services.
 
 
 [7]
 R. at 1667-68; see also 7 R. at 1672-73, 1675-76, 1678-79, 1681, 1684-85, 1690-91, 1693-94. Some of the osteopaths' assertions in this regard were struck by the district court after their deposition testimony revealed that they had never referred patients to the M.D. urologists on staff at Christian. See 1 R. at 301-04. The plaintiffs have not appealed this decision by the district court. Consequently, we grant their motion to strike the appendices filed by defendants because the documents they contain either repeat material in the record or do not bear on any issue on appeal
 
 
 [6]
 Flegel and Still argue that the presence of expert testimony by two economists suffices to survive summary judgment. That is only true if the experts' testimony would allow a finding of actual detrimental effects to competition. The testimony of neither of the proffered experts, Professor Lee K. Benham and John H. Preston, would support such a finding. Preston simply relies on the assertions of the GPDOs to find a reduction in quality, and Benham's testimony addresses only the possibility that the hospital services market in St. Louis is not competitive. A jury could not reasonably find based on these affidavits that the denial of privileges to Flegel and Still by Christian has caused actual detrimental effects to competition (to Flegel and Still, perhaps, but not to competition)
 
 
 [7]
 The plaintiffs' perspective on the market has no bearing. Whether their business has suffered due to the absence of the potential referrals at Christian is of as little consequence as any evidence that their business is booming. See Ryko Mfg. Co. v. Eden Servs., 823 F.2d 1215, 1234 (8th Cir.1987) ("the concern of antitrust law is the protection of competition, not individual competitors"), cert. denied, 484 U.S. 1026, 108 S.Ct. 751, 98 L.Ed.2d 763 (1988); Janich Bros., Inc. v. American Distilling Co., 570 F.2d 848, 855 (9th Cir.1977) ("Antitrust legislation is concerned primarily with the health of the competitive process, not with the individual competitor who must sink or swim in competitive enterprise." (citations omitted)), cert. denied, 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978)
 
 
 [8]
 Compare the plaintiffs' description of the relevant market in their memorandum to the district court in opposition to summary judgment: "The relevant product market is the market for referrals of Target Patients from osteopathic physicians at [Christian]." 1 R. at 201