64 F.3d 340
 1995-2 Trade Cases P 71,085
 Gilbert BATHKE; Valoris Bathke; Ronald Condon; Lanina
Condon; Panora Oil Company; Martin Kress;
Annette Kress; Anne Lubeck; Petroleum
Marketers of Iowa, Plaintiffs-Appellants,
v.
CASEY'S GENERAL STORES, INC., Defendant-Appellee.
 No. 94-3776.
 United States Court of Appeals,
Eighth Circuit.
 Submitted May 15, 1995.
Decided Aug. 11, 1995.
 
 Barry J. Nadler and James A. Brewer, Ames, IA, for appellant.
 Edward W. Remsburg and H. Richard Smith, Des Moines, IA, for appellee.
 Before McMILLIAN, BEAM, and HANSEN, Circuit Judges.
 HANSEN, Circuit Judge.
 
 
 1
 The plaintiffs, gasoline retailers located in small towns, appeal the district court's[1] order granting summary judgment to the defendant, Casey's General Stores, Inc., a multi-state retailer of gasoline and other goods, on the plaintiffs' complaint alleging that Casey's had sold gasoline at below-cost prices to destroy or control competition in violation of federal and state antitrust laws. The district court held that the plaintiffs failed to produce sufficient evidence to create a jury question on three required elements of their unfair pricing claims: the relevant geographic market, that Casey's was selling gas below cost, and that Casey's had either a reasonable prospect or a dangerous probability of recouping its investment in the alleged below-cost prices. We affirm.
 
 I.
 
 2
 There are no significant factual disputes on the questions presented for our review. The only dispute concerns the legal sufficiency of the plaintiffs' evidence to raise a jury question.
 
 
 3
 The named plaintiffs and the nearly 175 class members they represent (hereinafter "plaintiffs") owned or operated gasoline stations in small Iowa towns in 1988. The plaintiffs' stores were located in 67 Iowa towns where Casey's had convenience stores that sold gasoline. Each of the 67 towns has a population of fewer than 5500 persons.
 
 
 4
 Casey's is a multi-state retailer of gasoline and other merchandise, and operates over 800 convenience stores in Iowa, Missouri, Illinois, Minnesota, Nebraska, Kansas, Wisconsin, and South Dakota. Casey's owns approximately 600 of the stores and the remainder are owned by franchisees. It owns all of the stores in the 67 Iowa towns involved in this case.
 
 
 5
 During the 1980's some of Casey's competitors for gasoline business began converting their gasoline stations to convenience stores and generally upgrading their facilities. These competitors began to gain a larger percentage of the gasoline market at Casey's expense. From 1984 through early 1988, Casey's gasoline sales for its company stores dropped from 450,000 gallons per year to nearly 365,000 gallons per year per store.
 
 
 6
 Casey's internal company documents indicate that sometime during 1987, Casey's decided to take action to restore the lost volume of gasoline sales in certain towns. Casey's directed company-owned stores where volume had fallen below thirty thousand gallons per month to reduce the price of gas until the store restored the thirty thousand gallon volume. Casey's directed stores losing sales to competition to reduce gas prices to regain the volume. Casey's instructed stores selling at least thirty thousand gallons monthly simply to price competitively. These pricing directives did not target towns or markets of any particular population or geographic size. Casey's gave a different set of instructions to stores that faced new competitors or unusual competitive situations. Casey's goal was to achieve gasoline sales of thirty thousand gallons per month in each store.
 
 
 7
 On December 4, 1990, the plaintiffs filed this three-count anti-competition lawsuit against Casey's. Count I alleged that Casey's engaged in discriminatory pricing practices in violation of section 2(a) of the Robinson-Patman Act, 15 U.S.C. Sec. 13(a). Count II alleged that Casey's engaged in predatory pricing in violation of section 2 of the Sherman Act, 15 U.S.C. Sec. 2. Count III alleged violation of the Iowa unfair discrimination statute, Iowa Code ch. 551 (1989). The district court certified this case as a class action in 1993.
 
 
 8
 The plaintiffs' theory underlying all three of its claims in this case is that Casey's developed and implemented a plan to target and destroy, or to tame, rival gasoline sellers in small Iowa towns by pricing its gasoline below cost for a period of time. The plaintiffs contend that in towns where rivals were destroyed, Casey's then would recoup its losses on the below cost gasoline sales by charging monopoly prices far above normal competitive market prices. The plaintiffs contend that in towns where the rivals were tamed, oligopolistic pricing of gasoline resulted because the rivals realized their peril and tacitly accepted charging their customers excessive gasoline prices.
 
 
 9
 Casey's first moved for summary judgment before the parties had completed discovery. The district court denied Casey's motion. After the parties completed extensive discovery, Casey's again moved for summary judgment. Casey's also filed a motion to dismiss some class members who had not complied with discovery orders or, alternatively, to decertify the class.
 
 
 10
 On August 23, 1994, the district court held an all day hearing on the motions. The district court eventually denied Casey's motion to decertify the class, but dismissed with prejudice the claims of class members who had not complied with discovery requests. The district court held two additional hearings on the motion for summary judgment, on September 8, 1994, and October 11, 1994, each hearing lasting about two hours. On October 14, 1994, the district court granted Casey's motion for summary judgment.
 
 
 11
 In entering summary judgment, the district court held that the plaintiffs failed to present sufficient evidence to create a jury question on three essential requirements of their unfair pricing scheme claims under both the Sherman Act and the Robinson-Patman Act. The district court ruled that the plaintiffs produced insufficient facts: (1) to establish the relevant geographic market, (2) to establish that Casey's sold the gasoline below its cost, or (3) to establish that Casey's would be able to recoup its losses and actually profit from this alleged illegal pricing scheme. Accordingly, the district court entered judgment in favor of Casey's on the plaintiffs' two federal claims, and dismissed without prejudice the Iowa state law unfair discrimination claim. The district court also assessed against the plaintiffs Casey's costs of taking certain depositions. The plaintiffs appeal both the decision granting summary judgment and the decision assessing costs.
 
 II.
 
 12
 " 'In complex antitrust cases, no different or heightened standard for the grant of summary judgment applies.' " Flegel v. Christian Hosp., Northeast-Northwest, 4 F.3d 682, 685 (8th Cir.1993) (quoting Amerinet, Inc. v. Xerox Corp., 972 F.2d 1483, 1489-90 (8th Cir.1992)), cert. denied, --- U.S. ----, 113 S.Ct. 1048, 122 L.Ed.2d 356 (1993). We review de novo the district court's decision granting summary judgment. Willman v. Heartland Hosp. East, 34 F.3d 605, 609 (8th Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 1361, 131 L.Ed.2d 218 (1995). We must review the record in the light most favorable to the non-moving party and determine whether the movant demonstrated that there are no genuine issues of material fact for trial and that it is entitled to judgment as a matter of law. See id. at 609-610.
 
 
 13
 We note at the outset that the Supreme Court has urged great caution and a skeptical eye when dealing with unfair pricing claims. " '[P]redatory pricing schemes are rarely tried, and even more rarely successful,' Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 589, 106 S.Ct. 1348, 1357, 89 L.Ed.2d 538 (1986), and the costs of an erroneous finding of liability are high." Brooke Group, Ltd. v. Brown & Williamson Tobacco, --- U.S. ----, ----, 113 S.Ct. 2578, 2589, 125 L.Ed.2d 168 (1993).
 
 
 14
 "The mechanism by which a firm engages in predatory pricing--lowering prices--is the same mechanism by which a firm stimulates competition; because 'cutting prices is the very essence of competition ...[;] mistaken inferences ... are especially costly, because they chill the very conduct the antitrust laws are designed to protect.' " Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104, 122 n. 17 [107 S.Ct. 484, 495 n. 17, 93 L.Ed.2d 427] (1986) (quoting Matsushita, 475 U.S. at 594 [106 S.Ct. at 1359-60]). It would be ironic indeed if the standards for predatory pricing liability were so low that antitrust suits themselves became a tool for keeping prices high.
 
 
 15
 Id. at ----, 113 S.Ct. at 2589-90. With these guidelines in mind, we turn to the merits of the issues presented for our review.
 
 
 16
 The plaintiffs allege that Casey's engaged in a pricing scheme that violated both section 2 of the Sherman Act, 15 U.S.C. Sec. 2, and section 2(a) of the Robinson-Patman Act, 15 U.S.C. Sec. 13(a). Section 2 of the Sherman Antitrust Act provides:
 
 
 17
 Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony....
 
 
 18
 15 U.S.C. Sec. 2. Although this section reads as a criminal statute, the antitrust laws provide a civil cause of action arising from a violation of this section. See 15 U.S.C. Sec. 15(a). By its language, section two of the Sherman Act is directed at controlling monopolies. Section two of the Sherman Act prohibits predatory pricing "when it poses 'a dangerous probability of actual monopolization.' " Brooke Group, --- U.S. at ----, 113 S.Ct. at 2587 (quoting Spectrum Sports, Inc. v. McQuillan, --- U.S. ----, ----, 113 S.Ct. 884, 890, 122 L.Ed.2d 247 (1993)). Predatory pricing means pricing a product below some objective measure of its cost. Matsushita, 475 U.S. at 585 n. 8, 106 S.Ct. at 1355 n. 8.
 
 
 19
 Section 2(a) of the Robinson-Patman Act, a more detailed statute specifically addressing certain forms of price discrimination, provides:
 
 
 20
 It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality ... where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them.
 
 
 21
 15 U.S.C. Sec. 13(a). "By its terms, the Robinson-Patman Act condemns price discrimination only to the extent that it threatens to injure competition." Brooke Group, --- U.S. at ----, 113 S.Ct. at 2586. The type of price discrimination injury under this statute "which harms direct competitors of the discriminating seller, is known as primary-line injury." Id. The plaintiffs' Robinson-Patman claim against Casey's alleges harm to direct competitors and thus is a primary-line injury claim.
 
 
 22
 "[I]t has become evident that primary-line competitive injury under the Robinson-Patman Act is of the same general character as the injury inflicted by predatory pricing schemes actionable under Sec. 2 of the Sherman Act." Id. at ----, 113 S.Ct. at 2587.
 
 
 23
 There are, to be sure, differences between the two statutes. For example, we interpret Sec. 2 of the Sherman Act to condemn predatory pricing when it poses a dangerous probability of actual monopolization, ... whereas the Robinson-Patman Act requires only that there be a reasonable possibility of substantial injury to competition before its protections are triggered.... But whatever additional flexibility the Robinson-Patman Act standard may imply, the essence of the claim under either statute is the same: A business rival has priced its products in an unfair manner with an object to eliminate or retard competition and thereby gain and exercise control over the prices in the relevant market.
 
 
 24
 Id. (internal citations and quotations omitted) (emphasis added).
 
 
 25
 The focus of these cases is the effect in the relevant market of reduced competition on consumers, not the competitors. "It is axiomatic that the antitrust laws were passed for 'the protection of competition, not competitors.' " Id. at ----, 113 S.Ct. at 2588 (quoting Brown Shoe Co. v. United States, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962)). Inflicting painful losses on competitors "is of no moment to the antitrust laws if competition is not injured." Id.
 
 
 26
 In proving a pricing violation in a relevant market, under both Sec. 2 of the Sherman Act and section 2(a) of the Robinson-Patman Act, there are two prerequisites to recovery. Id. at ----, 113 S.Ct. at 2587. "First, a plaintiff seeking to establish competitive injury resulting from a rival's low prices must prove that the prices complained of are below an appropriate measure of its rival's costs." Id. In short, the plaintiff must prove the rival was pricing below cost. "The second prerequisite to holding a competitor liable under the antitrust laws for charging low prices is a demonstration that the competitor had a reasonable prospect, or, under Sec. 2 of the Sherman Act, a dangerous probability, of recouping its investment in below-cost prices." Id. at ----, 113 S.Ct. at 2588. In short, the plaintiff must prove the defendant's eventual ability to recoup its losses from pricing below cost. Actually, the defendants must recoup "more than the losses suffered." Id. (quoting Matsushita, 475 U.S. at 588-89, 106 S.Ct. at 1356-57).
 
 
 27
 As noted above, the district court found that the plaintiffs failed to present sufficient evidence to create a jury question on three required elements of the pricing claims under Brooke Group: relevant market, pricing below cost, and recoupment. Because we find the plaintiffs' failure to produce evidence of the relevant market dispositive, we will not address the other issues.
 
 A.
 
 28
 The district court held that the plaintiffs' antitrust claims failed because they did not produce sufficient evidence to create a jury question on the relevant geographic market of competition. In particular, the district court found that the plaintiffs failed to create a jury issue on their contention that the relevant geographic markets were the 67 separate small towns (and their immediate surrounding areas) involved in this case.
 
 
 29
 The plaintiffs do not dispute that they were required to establish the relevant geographic market to recover under their unfair pricing theory. As we noted above, the essence of both a Sherman Act and Robinson-Patman Act claim is that a business engaged in unfair pricing in order to "gain and exercise control over prices in the relevant market." Brooke Group, --- U.S. at ----, 113 S.Ct. at 2587. (emphasis added). While it has long been clear that plaintiffs asserting claims of monopolization in violation of section 2 of the Sherman Act were required to prove the relevant geographical market, see Spectrum Sports, --- U.S. at ----, 113 S.Ct. at 892 ("demonstrating the dangerous probability of monopolization in an attempt case also requires inquiry into the relevant product and geographic market and the defendants' economic power in that market"); Morgenstern v. Wilson, 29 F.3d 1291, 1295-96 (8th Cir.1994) (to determine whether the defendants have the market power required for monopolization liability, the plaintiffs had to demonstrate a well defined product and geographic market), we also have required plaintiffs asserting a Robinson-Patman Act predatory pricing claim to submit proof of the relevant market as well, Henry v. Chloride, Inc., 809 F.2d 1334, 1347 (8th Cir.1987); see also Herbert Hovenkamp, Federal Antitrust Policy, Sec. 3.1, at 79 n. 6 (1994) ("When predatory pricing is challenged as a so-called 'primary line' violation of the Robinson-Patman Act, 15 U.S.C. Sec. 13, most courts require that a relevant market be defined as well") (citing Henry, 809 F.2d at 1347).
 
 
 30
 "Like any other issue, market definition is subject to summary judgment if the plaintiffs fail to provide sufficient evidence from which a jury could reasonably find in their favor." Flegel, 4 F.3d at 689. Antitrust claims often rise or fall on the definition of the relevant market. See Morgenstern, 29 F.3d at 1296 ("An actual monopolization claim often succeeds or fails strictly on the definition of the product or geographic market."). The definition of the relevant market has two components--a product market and a geographic market. Flegel, 4 F.3d at 689; see also Spectrum Sports, --- U.S. at ----, 113 S.Ct. at 892. The definition of the geographic market is the only one at issue here because the parties agree that the relevant product market is gasoline.
 
 
 31
 The proper definition of a geographic market is determined by a " 'factual inquiry into the "commercial realities" faced by consumers.' " Flegel, 4 F.3d at 690 (quoting Eastman Kodak Co. v. Image Tech. Serv., Inc., 504 U.S. 451, 452-56, 112 S.Ct. 2072, 2076, 119 L.Ed.2d 265 (1992) (quoting United States v. Grinnell Corp., 384 U.S. 563, 572, 86 S.Ct. 1698, 1704-05, 16 L.Ed.2d 778 (1966)). "The geographic market encompasses the geographic area to which consumers can practically turn for alternative sources of the product and in which the antitrust defendants face competition." Morgenstern, 29 F.3d at 1296 (citing Baxley-DeLamar Monuments, Inc., v. American Cemetery Ass'n, 938 F.2d 846, 850 (8th Cir.1991)); see also Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 327, 81 S.Ct. 623, 627-28, 5 L.Ed.2d 580 (1961) (defining relevant geographic market as "the market area in which the seller operates, and to which the purchaser can practicably turn for supplies."). The plaintiffs bear the "burden of establishing that a specified area constitutes a relevant geographic market." Morgenstern, 29 F.3d at 1296.
 
 
 32
 In Morgenstern, we concluded that the plaintiffs' expert testimony and evidence was insufficient to establish a relevant geographic market because the plaintiffs' evidence "failed to address a critical legal question: where could consumers of the product ... practicably turn for alternative sources of the product." Id. Here, there is an identical failure of proof.
 
 
 33
 The plaintiffs' expert in this case relied on price differences between Casey's stores in different towns as an indication that those towns (and their surrounding areas) were separate markets. The plaintiffs' expert also relied on testimony from class members that most of their business came from in-town customers and that they priced their gas to compete with other in-town prices. The record is virtually silent, however, on the issue of where the consumer could "practicably turn for alternative sources" of gas. Id. This silence is fatal to the plaintiffs' case under Morgenstern.
 
 
 34
 The plaintiffs' evidence, viewed in a light most favorable to them, suggests that gasoline retailers considered other in-town stores as their competitors and that consumers preferred to buy their gasoline in the small towns where they lived. Evidence of the competitor's perspective is not sufficient, however, because a geographic market is determined by inquiring into the "commercial realities" faced by consumers.' " Flegel, 4 F.3d at 689 (quoting Eastman Kodak Co. v. Image Tech. Serv., Inc., 504 U.S. 451, 452-56, 112 S.Ct. 2072, 2076, 119 L.Ed.2d 265 (1992)) (emphasis added) (other citation omitted). Likewise, evidence of consumers' actual habits is not enough to establish relevant geographic market under our cases. In Morgenstern, we rejected as insufficient both evidence detailing where consumers actually went for services as well as evidence indicating that consumers tended to go close to home for services because the evidence did not address where they could practicably go for the products and services. 29 F.3d at 1296-97. Thus, even if we fully credit the testimony from a number of the plaintiffs that consumers in the class towns prefer to buy gasoline close to home, there is still an absence of evidence on a critical question: where those gasoline consumers could practicably turn for alternatives.
 
 
 35
 A leading antitrust treatise further demonstrates the logic and necessity of applying such a requirement in this case:
 
 
 36
 ... a court would often be mistaken to conclude that a seller's "trade area," or the area from which it currently draws its customers, constitutes a relevant geographic market. In fact, the "trade area" and the "relevant market" are precisely reverse concepts.
 
 
 37
 Consider the following illustration. Fifteen miles outside of City A is a small town, Town B, which contains a single shoe store, Smith's Clothing. The only people who ever shop in Smith's Clothing are residents of Town B. When Smith's is accused of monopolization, the plaintiffs argue that Town B defines the relevant geographic market, since all of the store's customers come from there. In that case, Smith's market share is 100%.
 
 
 38
 But further inquiry shows the following. Last year 800 residents of Town B purchased shoes. 400 of them purchased from Smith's Clothing, and the other 400 purchased from the numerous shoe stores in City A. Note that this conclusion is absolutely consistent with the proposition that Smith's "trade area" is Town B. The only customers Smith's had were from Town B, assuming no one drove from City A to buy shoes at Smith's. In fact, Smith's is probably in close competition with the City A shoe stores. To the extent Town B residents go into City A to work or to shop, they regard the City shoe stores as interchangeable, and would respond to any local price increase by purchasing even more of their shoes in City A.
 
 
 39
 In sum, "trade area" considers the extent to which customers will travel in order to do business at Smith's. "Relevant market" considers the extent to which customers will travel in order to avoid doing business at Smith's. Unfortunately, this means that using discovery to obtain the addresses of a seller's customers seldom provides us with useful information about geographic market. What we really need to know is the extent to which people from the immediate area can readily turn to alternative sellers, and the defendant is far less likely to have such information.
 
 
 40
 H. Hovenkamp, Federal Antitrust Policy, Sec. 3.6d, at 113-114 (footnotes omitted). Here, the plaintiffs' evidence, at best, demonstrates only the "trade area" of a Casey's store, i.e., the particular small town and immediate surrounding area. However, the plaintiffs have failed to present any evidence of "the extent to which customers will travel in order to avoid doing business" at a particular Casey's store. Id.
 
 
 41
 Requiring the plaintiffs to examine consumers' practicable alternatives in this case makes particularly good sense. Casey's has pointed to the unrefuted evidence that 42% of the people living in the relevant towns work elsewhere. Given these facts, it is entirely possible, if not likely, that those consumers have alternatives to purchase gas beyond their town of residence. See H. Hovenkamp, Federal Antitrust Policy, Sec. 3.6d at 113 ("To the extent that Town B residents go into City A to work or to shop, they regard the City shoe stores as interchangeable, and would respond to any local price increase by purchasing even more of their shoes in City A"). On these facts alone, it is a distinct possibility that Casey's could never gain the control of the competition in those towns because there would be too many people who could easily avoid monopolistic or oligopolistic prices by looking to alternative sources for gasoline that are beyond Casey's control. Thus, the alternatives available to the consumers in this case must be accounted for in determining the relevant geographic market.
 
 
 42
 In sum, the problem with the evidence the plaintiffs submitted to establish the relevant geographic market is that it looks at the issue only from the perspective of Casey's rivals, not from the perspective of the consumer. This is not the correct approach in antitrust cases. See Spectrum Sports, --- U.S. at ----, 113 S.Ct. at 891-92 (the purpose of the antitrust laws "is not to protect businesses from the working of the market; it is to protect the public from the failure of the market"). Accordingly, we must affirm the district court's conclusion that summary judgment is appropriate because the plaintiffs failed to create a jury question on the issue of the relevant geographic market.
 
 III.
 
 43
 The plaintiffs also argue that the district court erred in assessing $30,831.78 against them for costs Casey's incurred in taking depositions of class members. There is a presumption that the prevailing party is entitled to costs. Fed.R.Civ.P. 54(d) ("costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs"); Police Retirement Sys. v. Midwest Inv. Advisory Serv., 940 F.2d 351, 358-59 (8th Cir.1991) ("Federal Rule of Civil Procedure 54(d) codifies the presumption that, with exceptions not relevant here, costs will be awarded to prevailing parties"). We review the district court's decision to award costs for an abuse of discretion. Milton v. Des Moines, Iowa, 47 F.3d 944, 947 (8th Cir.1995), cert. denied, --- U.S. ----, 116 S.Ct. 87, --- L.Ed.2d ---- (1995).
 
 
 44
 The plaintiffs argue that the district court abused its discretion in awarding Casey's all of its deposition costs because: (1) many of the depositions were unnecessary or too broad in scope; and (2) the district court did not rely on all of the depositions in deciding the case.[2] The district court rejected both of these arguments, finding that the depositions were necessary and specifically indicating that it relied on the depositions in ruling on the motion for summary judgment. The district court is in the best position to make these determinations. As such, we cannot conclude in this case that the district court abused its substantial discretion in assessing the deposition costs against the plaintiffs. See Richmond v. Southwire Co., 980 F.2d 518, 520 (8th Cir.1992) ("The district court has substantial discretion in awarding costs").
 
 IV.
 
 45
 For the reasons stated above, we affirm the judgment of the district court.
 
 
 
 [1]
 The Honorable Charles J. Wolle, Chief Judge, United States District Court for the Southern District of Iowa
 
 
 [2]
 To the extent that the plaintiffs are arguing about the amount of costs the district court awarded, we have no jurisdiction over that issue. Poe v. John Deere, Co., 695 F.2d 1103, 1108-09 (8th Cir.1982)